UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
DEBORAH PERRETTI,

        Plaintiff,

   - against -

ALMA BANK AND RICHARD FERRANTI,
RENO CORTIDIS, BILL KATSANEVAS,
individually and in their official capacities as
aiders and abettors,

        Defendants.
-------------------------------------------------------------- X

**MEMORANDUM
DECISION AND ORDER**

11 Civ. 3925 (BMC)

**COGAN**, District Judge.

   Plaintiff brings this action under Title VII and corresponding state and local law, claiming that she never received a promised promotion or a raise, and then suffered termination, all because of her race (Hispanic) and national origin (Argentine). She also claims that defendants retaliated against her for exercising her right to take family leave by diminishing her work responsibilities. Defendants have moved for summary judgment.

   Viewing the record in a light most favorable to plaintiff, it is arguable as to whether she was dealt with somewhat harshly following a series of errors in the performance of her job. However, there is no evidence at all upon which a reasonable jury could find that her treatment was the result of her race, national origin, or in response to her having taken family leave. Defendants' motion is accordingly granted.

## BACKGROUND

Plaintiff was hired to work at defendant bank in 2006 by the bank's president, Luis Rebatta, who is also Hispanic and of Peruvian national origin. Plaintiff was given the position of "Head Teller" based on her eight years of experience in banking; no other employees held that title. She received an annual salary of $40,000 per year. Plaintiff was sent to Alabama for an outside training session in the bank's computer systems, and she was accompanied by another teller, Erica Hinojosa, and Richard Ferranti, the Chief Operating Officer of the bank, who is Italian-American. Plaintiff has a Spanish accent, and Ferranti, Rebatta, and other management-level employees knew plaintiff's ethnicity and national origin at or shortly after the time she joined the bank in 2006.

When plaintiff was hired, she had a conversation with defendant Reno Kourtides, who at the time was the Business Developer of the bank, and is now the bank's Chief Planning Officer and the Secretary of the Board of Directors. Kourtides told plaintiff that he would make her the Training Coordinator for new employees. However, it is undisputed that the bank never created the position of Training Coordinator and that plaintiff never received a promotion, although she subsequently made a general request for one from her Branch Manager, Bill Katsanevas. Katsanevas responded that she would be promoted when a position became available.

The bank was in its start-up phase when plaintiff began in 2006, and it did not open its doors to customers until September 2007. It made a particular effort to target the Greek and Greek-American community for its market base. Eight of the nine directors of the bank are Greek or Greek-American, and a good portion of its clientele is Greek-American. The main branch is in Astoria, Queens, and it had at least one branch in Brooklyn. Plaintiff worked in Astoria except for one brief period described below.

2

From the outset of her employment, plaintiff and Katsanevas did not get along. He would berate her and yell at her in front of the tellers she was supervising. She did not observe him treating any of the Greek-American employees this way. Plaintiff complained about the way Katsanevas treated her to Human Resources and to Ferranti. She told Ferranti that she believed Katsanevas was discriminating against her because of her race or national origin. Ferranti discussed her complaints with Katsanevas, but no one at the bank took action against him.

Plaintiff's annual performance evaluations indicated an overall performance of "Good." "Good" equates to a "C" grade on the bank's evaluation scale. Her 2007 evaluation noted that she "needs to improve on her relationship with coworkers and supervisors." Her 2008 evaluation stated that she "needs to concentrate and effectively lead her staff – must avoid errors and help overall improve her performance." The evaluations were made by Katsanevas, although he consulted with the Assistant Branch Manager, Krisanthi Lilaj, on the 2008 evaluation. Plaintiff never received a raise during her tenure at the bank. Although it is the usual practice of the bank to give employees some annual raise, there is no evidence that any of the tellers working under Katsanevas ever received one.

In January, 2008, plaintiff was temporarily transferred to the Brooklyn branch for an indefinite period because there was only one full-time teller at that branch. Other tellers from Astoria were also transferred to Brooklyn on a rotating basis. Plaintiff agreed to the temporary transfer because, according to her, she is a "team player." At the Brooklyn branch, she had somewhat less responsibility, as she only supervised one teller, as opposed to the two or three she supervised in Astoria. Plaintiff worked there for three weeks, after which time she complained that the daily 3-hour round-trip commute was too stressful for her, and that the bank

3

had given the other Astoria tellers a shorter rotation in Brooklyn. The bank complied with her request to resume her responsibilities in Astoria and she returned to that branch by February 4, 2008.

Plaintiff took two months' paid and one month unpaid maternity leave beginning in August 2008. She believed that Rosemerys Perez from the bank's human resources department had told her that she would be paid for three months, but the bank's policy only allowed for two. When she returned in November 2008, she found that her duties of filing and reviewing Cash Transaction Reports ("CTRs") had been transferred to the bank's compliance department, where they were performed by an auditor named Joseph Minchul-Song. However, the initial preparation of CTRs, and the daily "proving" of transactions to ensure that they were generated, remained with plaintiff and every other teller. In other words, each teller, including plaintiff, had to prepare a CTR when he or she processed a transaction involving $10,000 or more in cash.

Plaintiff was cited and written up for several procedural violations committed in the course of performing her duties, the last of which, defendants contend, resulted in her termination. In August 2008, she gave a client $2,000 upon presentation of a check for $200. Fortunately, the client returned the money after plaintiff and/or Lilaj called and requested that he do so.[1] In April 2009, plaintiff received a cash deposit that included currency that was rejected by the bank's cash dispenser. However, because the cash did not turn black when plaintiff tested it with a counterfeit pen, plaintiff passed it to another teller, who, not knowing the counterfeit nature of the currency, distributed it to a customer. Fortunately, again, the customer returned the funds to the bank. In her write-ups for each of these incidents, plaintiff was advised that she could be terminated if she continued to make mistakes.

---

[1] Plaintiff testified quite clearly that she called the customer. However, Lilaj's report on the incident says that she called the customer.

4

The action which defendants contend, together with her prior infractions, resulted in her termination occurred on May 4, 2009, when she processed a cash transaction involving $11,200 without inputting the data necessary to generate a CTR. Plaintiff acknowledges that she deliberately hit the "override" button to avoid generation of the report, but contends that this was necessary because the customer was a new client that had not yet been entered into the bank's databases, so a report could not be generated. However, it is undisputed that plaintiff then failed to adequately "prove" her transactions that day, which would have uncovered the absence of the CTR. Minchul-Song, as part of his compliance review, caught the error in early June 2009, and the bank had to report the error to the federal authorities, as required by law, although no action was taken against it.

Plaintiff was terminated on June 11, 2009, which was almost immediately following Minchul-Song's discovery of the missing CTR. She received her salary through June 15, 2009. Ferranti made the decision to terminate her in consultation with the bank's human resources department. Plaintiff was advised of her termination in a meeting with Ferranti, Perez, and Lilaj. Ferranti told plaintiff that he was terminating her because she had failed to generate the CTR, and he had to show the auditors that he was taking strong action for that lapse. He acknowledged in his deposition that he did not consider disciplinary measures short of termination. According to plaintiff, Lilaj told her that she did not agree with the decision to fire her. Katsanevas had no input into the decision; he had been transferred out of plaintiff's department and no longer had supervisory responsibility over her at the time of the CTR incident.

Plaintiff's position remained open for nearly a year after her termination. In May 2010, the bank hired a new Head Teller named Demetra Bakopoulos, who is Greek or Greek-

5

American. She was given a salary about 15% less than plaintiff had received four years earlier ($34,000 v. $40,000). She received a 5% salary increase after a year, which still left her with about $5,000 less than plaintiff had earned when she was hired.

## DISCUSSION

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986); see also Fed. R. Civ. P. 56(a). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). The court must construe the facts in the light most favorable to the non-moving party, and draw all reasonable inferences and resolve any ambiguities against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348 (1986); Ideal Steel Supply Corp. v. Anza, 652 F.3d 310, 326 (2d Cir. 2011). However, a party may not defeat a motion for summary judgment solely through "unsupported assertions" or conjecture. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) (non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment"). Rather, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 587, 106 S. Ct. 1348 (emphasis deleted); see also D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998) (the non-moving party "must offer some hard evidence that its version of the events is not wholly fanciful").

6

District courts must be cautious about granting summary judgment when discriminatory intent is at issue since "a victim of discrimination . . . is seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991). However, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). "[T]he salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to other areas of litigation." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (internal quotation marks and alteration omitted). Thus, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu–Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001).

I.     **Plaintiff's Claim of Discrimination**

The framework for analyzing discrimination claims under Title VII is venerable. Under McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973), a plaintiff asserting a claim for employment discrimination bears the initial burden of establishing a *prima facie* case of discrimination. See Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 142, 120 S. Ct. 2097 (2000). To establish a *prima facie* case, a plaintiff must demonstrate: "(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir. 2009) (quoting Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008)). The burden of demonstrating a *prima facie* case is *de minimis*. Abdu-Brisson, 239 F.3d at 467.

7

As to the fourth element, a plaintiff may seek to raise an inference of discrimination by "showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group." Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation marks omitted). A plaintiff must be similarly situated "in all material respects to the individuals whom [she] seeks to compare [her]self with." Id. (quoting Graham v. LIRR, 230 F.3d 34, 39 (2d Cir. 2000)). "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury." Id. However "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001) (citing Cruz v. Coach Stores, 202 F.3d 560, 568 (2d Cir.2000)); see also Shumway v. UPS, 118 F.3d 60, 64 (2d Cir. 1997) (affirming grant of summary judgment because coworkers were not similarly situated).

If a plaintiff successfully establishes a *prima facie* case of discrimination, "the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action." Weinstock, 224 F.3d at 42. "Upon the defendant's articulation of such a non-discriminatory reason, the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture." Id. The burden then shifts back to plaintiff to "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." Id.

### A. Plaintiff's *prima facie* case

Plaintiff alleges that she suffered discrimination by way of three adverse employment actions: 1) her lack of a promotion; 2) her lack of a raise; and 3) her termination. Beginning first with her claim for lack of promotion, plaintiff offers in support the fact that she made a general

8

request for a promotion to Katsanevas, but never received one throughout her employment. Additionally, Kourtides promised her when she was hired that he would create and appoint her to the position of Training Coordinator, but he never did so. Plaintiff has failed to establish that her lack of a promotion amounts to an adverse employment action, and therefore has failed to make out a *prima facie* case of failure to promote.

The law is well-settled that to establish a *prima facie* case for such a claim, a plaintiff must show that "she applied for an available position for which she was qualified, but was rejected under circumstances giving rise to an inference of unlawful discrimination." Brown v. Coach Stores, 163 F.3d 706, 710 (2d Cir. 1998) (internal quotation marks omitted). The requirement that an employee apply for and be rejected for a specific position "ensures that, at the very least, the plaintiff employee alleges a particular adverse employment action, an instance of alleged discrimination, by the employer." Petrosino v. Bell Atl., 385 F.3d 210, 226 (2d Cir. 2004). However, in this case, plaintiff has put forth no evidence that she applied for any position at all. Rather, she only expressed a general interest to Katsanevas that she be promoted. Additionally, it is undisputed that the position of Training Coordinator was never created, and therefore she was never rejected for that job. Accordingly, her failure to promote claim is foreclosed by Brown and Petrosino. See also Cruz, 202 F.3d at 565-66 (affirming Rule 12(b)(6) dismissal of failure to promote claim in part because the plaintiff failed to put forth facts showing that defendant created the promised position); Holt v. KMI-Continental, 95 F.3d 123, 129 (2d Cir. 1996) (holding that with regard to one position, "plaintiff cannot make out a prima facie case [of failure to promote] because defendant did not seek applicants to fill the position"); Breland-Starling v. Disney Publ'g Worldwide, 166 F. Supp. 2d 826, 830 (S.D.N.Y. 2001) ("because the

9

position never existed and was never occupied by anyone, plaintiff cannot, as a matter of law, establish her *prima facie* case").[2]

On the other hand, plaintiff's termination and lack of a raise do constitute adverse employment actions, and thus the only element at issue regarding plaintiff's *prima facie* case as to these actions is the fourth element, i.e., are there circumstances that could give rise to an inference of discrimination? I note at the outset that this is not a case where a *prima facie* showing can be made based on disparate treatment of plaintiff compared to other employees. Plaintiff acknowledges that she "was not really similarly-situated to anyone because she was the only Head Teller at the main branch of the Bank during the course of her employment." Stated differently, as Head Teller, the bank might have expected a higher performance from plaintiff than it did from other tellers, and so discipline applied to her might not be relevant in comparison to discipline meted out to other tellers for similar conduct (and there is no evidence of similar conduct by other employees in this record). Of course, a plaintiff in a Title VII case is not required to offer comparables to satisfy the fourth McDonell-Douglas requirement; she can rely on any circumstantial evidence suggested by the record.

Viewing the facts in a light most favorable to plaintiff, there is evidence that plaintiff's termination was arbitrary and not very nice. On the other hand, it could be argued that it was,

---

[2] Plaintiff identifies two district court decisions that have considered the failure to create a promised position as a potential adverse employment action. See Williams v. R.H. Donnelley, Inc., 199 F. Supp. 2d 172, 178 (S.D.N.Y. 2002); Brooks v. Hevesi, No. 95 Civ. 3209, 1998 U.S. Dist. LEXIS 730, at *5-6 (S.D.N.Y. Jan. 29, 1998). However, these decisions conflate the third and fourth elements of a Title VII discrimination claim, requiring a plaintiff to raise an inference of discriminatory intent (the fourth element of a claim for discrimination) as a prerequisite to finding that the failure to create the position amounted to an adverse employment action (the third element). These decisions dismiss the failure to promote claim on the ground that the plaintiff failed to raise such an inference. See Williams, 199 F. Supp. 2d at 178; Brooks , 1998 U.S. Dist. LEXIS 730, at *5-6; see also Piccone v. Town of Webster, No. 09-CV-6266, 2011 U.S. Dist. Lexis 84574, at *23-27 (W.D.N.Y. Aug. 2, 2011) (not cited by plaintiff, but applying same standard and reaching same conclusion). Even if I were to accept the reasoning of these decisions and conclude that defendants' failure to create the position of Training Coordinator was an adverse employment action, plaintiff has still failed to establish a *prima facie* case because she has not pointed to any evidence that the position was not created because of plaintiff's ethnicity or national origin. See Brooks, 1998 U.S. Dist. LEXIS 730, at *5-6 (a mere broken promise does not suggest discrimination).

after all, plaintiff's responsibility in the first instance to generate the CTR and to catch it if she failed in that responsibility. Moreover, it could be argued that the termination was not arbitrary because of plaintiff's prior mistakes; certainly, it is not unreasonable to view a bank teller's negligent cashing of a check for ten times the face amount, or distribution of rejected counterfeit bills to a customer, as very serious matters, even if the bank does not lose any money or face regulatory consequences.

But the question is not whether plaintiff has raised a factual issue as to arbitrary or unfair termination. The issue she has a burden to raise is whether she was terminated because she is not Greek or Greek-American, or, conversely, whether she was terminated because she is Hispanic or Argentine. Plaintiff's *prima facie* case in this regard is minimal.

Plaintiff relies heavily on Rebatta's comment that she should try to reduce her Spanish accent, which he made prior to the bank's opening. Putting aside the fact that Rebatta is himself Hispanic (although with less of an accent), there is nothing in the record to suggest that he ever had any input into the terms or conditions of her employment after he hired her, nor in her supervision or evaluation, nor in the determination to fire her. He simply was not in her reporting line and there is no evidence to show that he ever talked to anyone about her. An arguably racially-insensitive management remark that bears some relationship to an adverse employment action can be evidence of discriminatory animus. See Kirsch v. Fleet St., Ltd., 148 F.3d 149, 162-63 (2d Cir. 1998) (finding evidence sufficient to support inference of discrimination where discriminatory statements were made by decisionmaker and could be interpreted as a "company threat"); Thompson v. Am. Eagle Airlines, Inc., No. 99 Civ. 4529, 2000 U.S. Dist. LEXIS 14932, at *15 (S.D.N.Y. Oct. 6, 2000) (finding *prima facie* case based on remark by supervisor who made decision to terminate because "a remark is not a 'stray remark'

if it has a close nexus to an adverse employment decision"). However, when an isolated statement does not factually relate to the context of a plaintiff's claim, especially when it is not particularly degrading to a plaintiff's national origin, ethnicity, or other protected class, it is usually considered a "stray remark" that carries little weight in determining the existence of a *prima facie* case. See Henry v. Wyeth Pharms., Inc., 616 F.3d 134, 149-50 (2d Cir. 2010) (approving multi-factor analysis of whether statements is probative of discriminatory intent that includes who made the remark, when it was made in relation to employment decision, its content, and its context, i.e., whether it was related to adverse employment action); Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007) ("the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination"); Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 94 (2d Cir. 2001) (finding that one statement by an executive is not enough to meet the plaintiff's burden of showing that the real reason he was fired was because of his age).

The other fact upon which plaintiff primarily relies is that she was replaced as Head Teller with a Greek-American, Bakopoulos, eleven months after she was fired. Plaintiff correctly points out that the Second Circuit has held that "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis." Zimmerman v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001). Zimmerman, however, which was an appeal from a jury verdict in the plaintiff's favor, and district court cases relying on it, generally have had significantly more circumstantial evidence of discriminatory animus than plaintiff has put forward here, which somewhat diminishes the import of the reference to the "mere fact" of replacement with someone outside the protected class. See, e.g., Zimmerman, 251 F.3d at 379

(executive claimed that he had fired plaintiff because she did not have a good relationship with her supervisor, but the supervisor testified that he had never spoken to the executive about plaintiff); Berube v. Great Atlantic & Pacific Tea Co., Inc., No. 3:06-cv-00197, 2010 U.S. Dist. LEXIS 76746, at *33-34 (D. Conn. July 29, 2010) (in disability discrimination case, not only was plaintiff replaced by non-disabled employees, but plaintiff was transferred, suspended, and then terminated shortly after multiple surgeries). Moreover, although Bakopoulos received the same title and responsibilities as plaintiff had, her hiring at a significantly reduced salary years after plaintiff first received that salary diminishes the inference of discrimination that plaintiff would have me draw.

Nevertheless, there is enough in the record to satisfy plaintiff's minimal burden with regard to her termination. The "mere fact" of Bakopoulos' hiring takes on added weight because it is not as if a woman was fired and replaced with a man; the replacement was a Greek-American, which bears directly on plaintiff's claim of favoritism.[3] In addition, Lilaj's alleged disagreement with the decision to fire plaintiff, and the failure of Ferranti to consider disciplinary alternatives short of termination, are sufficient for the *de minimis* showing.

However, although plaintiff has made a *prima facie* showing as to her termination, plaintiff is unable to point to any evidence showing that she was not given a raise because she is Hispanic or Argentine. Her claim with regard to that action is accordingly dismissed.

### B. Defendants' professed reasons for plaintiff's termination

The second McDonnell-Douglas criterion – that defendants offer a legitimate, non-discriminatory reason for the employment action – is readily satisfied here. Plaintiff had

---

[3] Plaintiff is entirely unclear as to whether she was discriminated against because she is Hispanic and/or Argentine, or because she is not Greek. They are not the same thing, but I am construing her theory to encompass both possibilities.

13

received two written warnings that additional mistakes could result in her termination, and she does not dispute that the failure to generate a CTR required the bank to report the lapse to federal regulatory authorities. Thus, plaintiff concedes her "misstep," but believes the failure to generate the CTR was compelled by the bank's computer system and therefore complied with bank policy. This argument is more properly considered under the third step of the McDonnell-Douglas analysis, as defendants have met their burden of production at step two by providing a business justification for plaintiff's termination. See Reeves, 530 U.S. at 142, 120 S. Ct. 2097 (defendant must only produce sufficient evidence for a trier of fact to conclude that plaintiff was fired for a legitimate, non-discriminatory reason, and the court cannot undertake a credibility evaluation); Tarshis v. Riese Org., 211 F.3d 30, 36 (2d Cir. 2000) ("[a]ny stated reason is sufficient"); Wentworth v. Hedson, 493 F. Supp. 2d 559, 569 (E.D.N.Y. 2007) (noting that even though the plaintiff challenged the defendants' justification, the defendants had "satisfied their minimal burden of proffering a nondiscriminatory reason for their actions"). I therefore address this point below.

### C. Evidence of pretext

With the presumption of discrimination from plaintiff's *prima facie* showing having dropped out of the case, see Weinstock, 224 F.3d at 42, I cannot see how any rational jury could view plaintiff's termination as being based in substantial part on discriminatory animus. Plaintiff's evidence of pretext is laden with disconnects. Her primary contention is that since no other employee was disciplined for the failure to generate the required CTR, that issue was a ruse to justify her termination. As evidence of this, she points to the fact that Minchul-Song took nearly a month to find her error, and when he did, he was not disciplined. She also points to the fact that her Assistant Manager, Lilaj, was not disciplined for plaintiff's alleged error, and the

14

head of compliance, John Pizzimanti (presumably Minchul-Song's boss), was also not disciplined.

The theory makes little sense. First, putting aside the conceded absence of similarly situated employees, plaintiff has made no showing that any of these employees that she says should have been disciplined (if she was going to be disciplined) were Greek or Greek-American, except perhaps for Lilaj, who was Albanian but spoke Greek. This means that plaintiff was singled out for some reason other than her race or ethnicity. The reason appears quite obvious; unlike the other employees as to whom she ascribes responsibility, plaintiff was in charge of generating the CTR for her own transaction, and had a history consisting of two prior errors. Moreover, if the title of Head Teller means anything, it is that she is supposed to be at least as skilled as other tellers. Yet she has offered no evidence, other than her belief, that another teller ever failed to generate a CTR in the relatively short existence of the bank. At most, plaintiff's theory of shared responsibility means that she was made a scapegoat for an incident that occurred under and on her watch because it was an embarrassment to the bank. But her evidence does not support a conclusion that she was made a scapegoat because of her national origin or ethnicity.

Plaintiff's view that under the bank's computer systems, a CTR cannot be generated when a transaction is undertaken by a new customer is another disconnect in her pretext theory. It would mean that plaintiff's incident was the only time where a new customer of the bank engaged in a transaction for more than $10,000, as the record is clear that no other teller has been found to have failed to generate a CTR.[4] In addition, plaintiff's justification does not explain

---

[4] Plaintiff objects to defendants' characterization of the method she used to avoid generating a CTR; i.e., that plaintiff "overrode" the system. Plaintiff prefers Ferranti's description of what she did, which is essentially that she failed to complete certain data fields in the transaction's entry form that would have generated the CTR. They are

15

why, when she was "proving" her own transactions, she did not note to someone that she had engaged in a transaction that needed to, but had not yet, generated a CTR, leaving it to Minchul-Song to catch in a compliance review almost one month later.

Plaintiff also considers it evidence of pretext that each of the errors or alleged errors that the bank claims led to her termination – cashing a check for an inflated amount, circulating counterfeit funds, and failing to generate a CTR – did not result in a monetary loss to the bank. Defendants, in turn, contend that the risk of reputational injury with its customers or its regulator justified her termination. However, the proportionality of the bank's response is not at issue here. Rather, the question is whether plaintiff has shown sufficient circumstantial evidence that would allow a rational factfinder to conclude that she was a victim of illegal discrimination.

The assumed fact that Ferranti was arbitrary, or unfair, or both, does not address, let alone meet plaintiff's burden on, this issue. A member of a protected class is no more entitled to protection from bosses of limited perspective or sagacity, or lack of empathy, than anyone else in the workforce. See, e.g., Ogbo v. N.Y. State Dep't of Fin., 99 Civ. 9387, 2001 U.S. Dist. LEXIS 12920, at *24 (S.D.N.Y. Aug. 28, 2001) ("an abusive workplace, without more, is not actionable under Title VII"). To show that she may have experienced something more than an unreasonable boss, plaintiff must point to some circumstances upon which a jury could reasonably reach a conclusion that plaintiff's race or ethnicity was a substantial factor in her termination. Plaintiff has failed to do that here.

## II. Plaintiff's Claim of Retaliation

The McDonnell-Douglas test also applies to retaliation claims under the FMLA. See Potenza v. City of N.Y., 365 F.3d 165, 168 (2d Cir. 2004). Plaintiff claims that upon her return

---

saying the same thing in different words. Indeed, it was plaintiff herself who testified: "So the only way I'm making the deposit is overriding the system."

from maternity leave, she learned that some of her responsibilities for CTRs had been moved to the bank's compliance department in retaliation for her having taken leave. Defendants dispute that any change was made to her responsibilities, but that even crediting plaintiff's version, it was not a material change in the terms and conditions of her employment.[5]

Plaintiff's testimony is extremely vague about what this alleged change was, other than that it had something to do with CTRs. Her brief refers to the task as "filing and initially reviewing" the CTRs, and I will assume that is the case, although her testimony does not say that. Whatever this responsibility was, it was not only her role that was transferred to the compliance department, but Rosemerys Perez's involvement in it as well.

In any event, all this appears to be is the movement of a discrete administrative function from the front office to the back office where it probably logically belonged in the first place; there is no reason for bank tellers to be filing government reports if the bank has a back office containing a compliance department. It does not nearly amount to "significantly diminished material responsibilities," which is the only type of adverse employment action potentially applicable here. See Beyer v. County of Nassau, 524 F.3d 160, 163-64 (2d Cir. 2008). Indeed, plaintiff's brief, although citing the proper legal standard, makes no argument at all as to why this transfer of responsibilities was a "material" or "significant" part of plaintiff's job, nor that it diminished her status or prestige at the bank in any way. Plaintiff therefore has failed to raise a factual issue that requires jury resolution.

---

[5] Plaintiff's brief is unclear as to whether she is pursuing the contention that her temporary assignment to Brooklyn was retaliatory. She describes the facts surrounding the transfer in her brief's factual summary, but never mentions them again in the argument, although she does cite a case holding that a transfer can be a material change in job responsibilities that gives rise to a retaliation claim. In any event, such a claim could not possibly succeed. Other tellers were transferred as well; her temporary transfer was months before she took leave; she consented to the transfer; and when it became burdensome, she asked to return, which request was promptly granted. There are no circumstances suggesting discriminatory animus motivated the transfer.

17

### III.  Plaintiff's Claims Under State and Local Law

Having dismissed plaintiff's federal law claims, the Court declines to exercise supplemental jurisdiction over plaintiff's state and local law claims in the interests of comity, convenience, judicial economy, and fairness. See Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (discussing a district court's discretion in declining to exercise supplemental jurisdiction over state law issues where all federal claims have been dismissed prior to trial); Klein & Co. Futures, Inc. v. Bd. of Trade of City of N.Y., 464 F.3d 255, 262 (2d Cir. 2006). Although the Judicial Code gives district courts the option of dismissing state law claims when all federal claims have been dismissed, see 28 U.S.C. § 1367(c)(3), my discretion "is not boundless." See Valencia ex rel. Franco v. Lee, 316 F.3d 299, 305 (2d Cir. 2003). Rather, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 108 S. Ct. 614 (1988); see also Birch v. Pioneer Credit Recovery, Inc., No. 06-CV-6497T, 2007 U.S. Dist. LEXIS 41834, at *15 (W.D.N.Y. June 8, 2007) (noting that "'absent exceptional circumstances,'" the Second Circuit instructs courts to "'abstain from exercising pendent jurisdiction'" over state claims where federal claims have been dismissed on summary judgment) (quoting Walker v. Time Life Films. Inc., 784 F.2d 44, 53 (2d Cir. 1986)). For this reason, district courts within this circuit frequently decline to exercise supplemental jurisdiction over a plaintiff's state law claims arising from the same acts as her federal discrimination claims. See, e.g., Mabry v. Neighborhood Defender Serv., 769 F. Supp. 2d 381,

402 (S.D.N.Y. 2011); Burchette v. Abercrombie & Fitch Stores, Inc., No. 08 Civ. 8786, 2010 U.S. Dist. LEXIS 47043, at *36 (S.D.N.Y. May 10, 2010).

I see no reason to depart from this practice here, as none of the factors noted above support retaining jurisdiction. Some of the issues posed by these claims are distinct from plaintiff's federal claims, and at this stage in the litigation, there would be "no extraordinary inconvenience or inequity occasioned by permitting the claims to be refiled in state court where they will be afforded a 'surer-footed reading of applicable law.'" Kolari, 455 F.3d at 123 (quoting United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S. Ct. 1130 (1966)).

## CONCLUSION

Defendants' motion for summary judgment is granted. Plaintiff's federal claims are dismissed with prejudice and plaintiff's state law claims are dismissed without prejudice.

**SO ORDERED.**

s/ BMC<br>
_____<br>
U.S.D.J.

Dated: Brooklyn, New York
      June 26, 2012